1        **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA**

3           **WESTERN DIVISION**

4   **THE HON. JUDGE VIRGINIA A. PHILLIPS, JUDGE PRESIDING**

5

6   **UNITED STATES OF AMERICA,**       **)**

                               **)**

7              **Plaintiff,**    **)**

                               **)**

8       **vs.**              **) NO. EDCR-17-00091-VAP**

                               **)**

9   **FAZLIDDIN KURBANOV,**           **)**

                               **)**

10             **Defendant.**     **)**

    _____**)**

11

12

13

14       **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15           **Sentencing Hearing**

16          **Los Angeles, California**

17        **Monday, August 13, 2018**

18

19

20

21

22     **LISA M. GONZALEZ, CSR No. 5920, CCRR**

          **U.S. District Courthouse**

23     **350 West 1st Street - Suite 4455**

       **Los Angeles, California 90012**

24            **213.894.2979**

          **www.lisamariecsr.com**

25

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:   OFFICE OF THE UNITED STATES ATTORNEY
                           BY:  ELIZABETH R. YANG
 3                         ASSISTANT UNITED STATES ATTORNEY
                           VIOLENT AND ORGANIZED CRIME SECTION
 4                         United States Courthouse
                           312 N. Spring Street
 5                         Los Angeles, California 90012
                           213.894.1785
 6
     FOR THE DEFENDANT:    FEDERAL PUBLIC DEFENDERS OFFICE
 7                         BY:  HILARY POTASHNER
                           FEDERAL PUBLIC DEFENDER
 8                         321 East Second Street
                           Los Angeles, California 90012
 9                         213.894.7867

10   Russian-speaking Interpreter:  Vladimir Ferkelman

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          Los Angeles, California; Monday, August 13, 2018;

2                          9:17 a.m.

3                            -o0o-

4          THE CLERK:  Calling Item Number 3 on the Court's

5    calendar, ED CR 17-00091-VAP, United States of America

6    versus Fazliddin Kurbanov.

7          Counsel, please come forward and state your

8    appearances for the record.

9          MS. YANG:  Good morning, Your Honor.  Elizabeth

10   Yang on behalf of the United States.  And joining me at

11   counsel table is Special Agent Ryan Crowley of the Federal

12   Bureau of Investigation.

13         THE COURT:  Thank you.

14         MS. POTASHNER:  Good morning, Your Honor.  Hilary

15   Potashner on behalf of Fazliddin Kurbanov who is present

16   before the Court with a Russian-speaking interpreter.

17         THE COURT:  Thank you.

18         Has the Government complied with the Crime Victims

19   Rights Act as to this proceeding?

20         MS. YANG:  Yes, Your Honor.  And victim Warden

21   Johnson is in attendance and would, at the appropriate time,

22   be prepared to make a statement to the Court.

23         THE COURT:  All right.  Thank you.

24         This matter is on the Court's calendar for

25   sentencing.

```
 1              Are both sides ready to proceed?
 2              MS. YANG:  Yes, Your Honor.
 3              MS. POTASHNER:  Yes, Your Honor.
 4              THE COURT:  Mr. Kurbanov, you're being assisted
 5   this morning by a Russian-language interpreter.
 6              Are you able to understand the interpreter when he
 7   is speaking to you in Russian?
 8              THE DEFENDANT:  Yes, I understand.
 9              THE COURT:  All right.  The presentence report was
10   disclosed on April 30th and the addendum on August the 8th.
11              Have you reviewed those with your client?
12              MS. POTASHNER:  They have been reviewed with
13   Mr. Kurbanov.
14              THE COURT:  Was it your co-counsel who did that?
15              MS. POTASHNER:  It was, Your Honor.  Thank you.
16              THE COURT:  Were they translated into Russian for
17   him?
18              MS. POTASHNER:  There was a Russian interpreter
19   present and Mr. Kurbanov does speak and read some English
20   and so he used the interpreter as needed.
21              THE COURT:  Mr. Kurbanov, have you reviewed with
22   your attorney, I think it was Ms. Gonzalez, the probation
23   office's reports in your case?
24              THE DEFENDANT:  Yes.  Yes, Your Honor.
25              THE COURT:  All right.  In addition to the
```

1  presentence report, I have considered the filings from both

2  sides.  The -- I have the dates in front of me -- the

3  Government's memorandum and the memorandum from the -- the

4  sentencing memorandum from the defense, which there was a

5  request to file under seal, and the attachments to that.

6          Is this everything both sides have filed?

7          MS. POTASHNER:  Yes, Your Honor.

8          MS. YANG:  Yes, Your Honor.

9          THE COURT:  Does either side have any objections

10 to the presentence report?  The Government originally had

11 some objections.  Those were corrected.  Otherwise, there

12 were no objections to the calculations in the presentence

13 report; is that correct?

14         MS. POTASHNER:  That is correct, Your Honor.

15         THE COURT:  All right.  I would adopt the factual

16 findings and the guideline calculations in the presentence

17 report.

18         Here, the advisory guideline range, which the

19 Court considers, along with all of the other factors set

20 forth at 3553(a), would be a sentence of 360 months or

21 30 years to life.  However, for the one count, Count 1, to

22 which the defendant pled guilty, the statutory maximum

23 sentence is 20 years or 240 months; a period of supervised

24 release from one year to life; and a fine ranging from

25 $50,000 to $250,000.

The offense level is calculated at 40.  The base offense level is 33 under Guideline Section 2a2.1, plus four levels under 2a2.1b1a because the victim sustained permanently bodily injury; plus six levels under 3a1.2c2 because this was an attack on a prison official while the defendant was in his custody.  So that results in a level of 43, minus three levels for acceptance of responsibility.

The defendant's criminal history category is III.

In 2016 he was convicted of conspiracy to provide material support to a foreign terrorist organization, three points, and then an additional two points because he was under sentence at the time of the offense here.  So five criminal history points.

The defendant's sentencing request is a sentence of 20 years, with 15 of those to run consecutively to the 300-month sentence he's serving for the conviction in Idaho.

The Government's sentencing request is a sentence of 20 years to run consecutively to that sentence.

Turning to the 3553(a) factors, starting with the nature and circumstances of the offense.

While the defendant was incarcerated at the FCI Victorville, he armed himself with a shank.  And in the mess hall, he grabbed the victim, the Warden C.J. from behind and attempted to slit his throat and succeeded in slashing the left side of the victim from his armpit to his hip bone,

1    required 80 -- not stitches but staples, a permanent scar,

2    and permanent nerve damage.  Two officers were injured in

3    trying to restrain the defendant.

4            And according to the defendant's admissions, he

5    specifically targeted this victim as he viewed him -- the

6    defendant viewed him as the chief or the person in charge.

7            The history and characteristics of the defendant.

8    He's 30 years old.  He was born in Tashkent, Uzbekistan.  He

9    has three siblings.  His parents now live in Idaho and they

10   have changed their names after his conviction.  He hasn't

11   been in contact with his family for some time.  His

12   childhood was marked by the fall of the U.S.S.R. and the

13   subsequent lawlessness in Uzbekistan.  His parents had

14   become evangelical Christians and were targeted -- the

15   family was targeted because of that.

16           He was injured when he was a bystander to a bomb

17   that exploded when he was 17 years old.  He was drafted into

18   the Uzbekistan army, where he contracted Hepatitis A and was

19   physically mistreated and beaten.  He fled Uzbekistan in

20   2008.  He was married in 2006, but divorced in 2017 after

21   the charges were brought against him in Idaho.  He has one

22   child, age nine, who lives with his former wife.

23           The defendant entered the United States in 2009 as

24   a refugee.  He's been in federal custody since 2013.  I

25   believe it was in connection with this offense that he

1    suffered an injury to his left foot, a fractured skull and a

2    concussion, and he suffers back pain.

3          He was diagnosed with schizophrenia in 2005.  He

4    has at least two suicide attempts.  He has a seventh grade

5    education in Uzbekistan and a commercial truck driving

6    license and work history in that field.

7          The need for the sentence to reflect the

8    seriousness of the offense, promote respect for the law and

9    provide just punishment.

10          This was a life -- well, actually to call it

11    life-changing is probably an understatement for the victim

12    in this case, who will, in addition to his physical

13    injuries, continue to suffer in his ability to do -- perform

14    his job.  I believe he was off of work for about a month

15    immediately after, and the defendant not only -- this wasn't

16    a spur of the moment attack.  It was planned.  And as I

17    said, this victim was specifically targeted not for anything

18    in particular that he had done to the defendant but because

19    the defendant viewed him as the head of the prison staff.

20          The need for the sentence to afford adequate

21    deterrence to criminal conduct.  The defendant was already

22    in custody at the time that he committed this very serious

23    offense.  So even though he was serving a sentence of

24    300 months, or 25 years, obviously that wasn't enough to

25    deter him from future criminal conduct.

1          There is, according to reports from the MDC, he

2     continues to say that he's targeting those who are working

3     at the MDC, particularly if they are veterans with history

4     of service in Afghanistan.

5          The need for the sentence to reflect the need to

6     protect the public from further crimes of the defendant.

7          Again, given the seriousness of both of the

8     offenses which he stands convicted but particularly this

9     most recent offense, that's an important factor.

10          The need to provide the defendant with

11     educational/vocational training, medical care, et cetera.

12     It's clear that he needs -- the diagnosis of schizophrenia,

13     which I think contributed to this offense.  He obviously

14     needs psychiatric treatment.

15          So part of the Court's decision will be a

16     directive to the B.O.P. that he receive psychiatric

17     treatment to address the schizophrenia, which is a very

18     serious disorder.

19          The need to avoid sentencing disparity.  As I

20     noted, the guideline sentence would be 30 years to life, but

21     there's a 20-year statutory maximum for Count 1.  I would

22     sentence the defendant to 20 years, to run consecutively

23     from the sentence imposed in the Idaho conviction.

24          And I think now would be the time for the victim

25     to address the Court.

1              MS. YANG:  Yes, Your Honor.

2              THE COURT:  So the defendant may be seated, and

3    then I'll hear argument from the defense, as well as the

4    Government.

5              MS. POTASHNER:  Yes, thank you, Your Honor.

6              THE COURT:  Thank you.

7              Could you state your name for the record, sir?

8              VICTIM JOHNSON:  Calvin Johnson.

9              THE COURT:  Thank you, Mr. Johnson.

10             VICTIM JOHNSON:  Well, first of all, it's

11   interesting.  I haven't read anything about this case since

12   this happened to me about two years ago, so hearing you read

13   the actual events, you know, pretty much, you know, just

14   brought light to how I'm lucky to be here standing in front

15   of you actually to testify, to tell my story.  It's very

16   rare that a victim -- actually it's hard to call myself a

17   victim.  I had to come to terms with calling myself a

18   victim.  So I am a victim.

19             But when that attack happened two years ago, you

20   know the only thing that I remember from that date was when

21   I was in the helicopter being air-lifted to the hospital.

22   And after all the trauma doctors did what they did to

23   actually save my life, to keep me from bleeding to death, I

24   can remember going home and then my brother calling me and

25   telling me that my mom's in the hospital.  So that attack on

1    me actually impacted my whole family.

2              THE COURT:  I should have mentioned this, but your

3    mother went into the hospital after she learned what

4    happened to you; correct?  I mean, your mother's

5    hospitalization was caused by her distress of what happened

6    to you?

7              VICTIM JOHNSON:  Oh, yes, yes, Your Honor.  Well,

8    she had a slight heart attack after that.

9              THE COURT:  All right.

10             VICTIM JOHNSON:  So I just remember getting that

11   news.  You know, I didn't know if my mom was going to live

12   or die.  So, you know, I really didn't know what was wrong

13   with her.  I just remember that event.

14             And also I remember the fear in my daughter's eye.

15   And my daughter lost her mother in 2009 from cancer, so the

16   thought on her face -- and just the look in her eyes to

17   think that, you know, she almost lost another parent.  She

18   was almost without any parents.  And just my daughters and

19   my son -- I just remember the impact of that attack.  It

20   affected so many lives.

21             I just remember being -- going back to the

22   institution because they took me from the dining facility to

23   actually institution hospital, and I just remember the fear

24   in the staff eyes.  I can just remember vivid things.  The

25   fear in the staff's faces, that, you know, a warden,

1    their -- their leader, their boss, laying on a table, pretty

2    much -- they didn't know whether I was going to die or live.

3           **So you're right, I was gone for about 30 days.**

4    **But there's something that I had to do.  Before I left and**

5    **went to Louisiana -- I actually got transferred to Louisiana**

6    **to another facility.  So I actually went back to the**

7    **institution to stand in the dining facility, not just for**

8    **me.  I had to do that in order for the staff to walk back in**

9    **that institution.**

10          **I don't know if I can address anything that you**

11   **said.  I'm not sure what I can say or can't say, but anyway**

12   **--**

13          **THE COURT:  You can say anything that you think I**

14   **need to know.**

15          **VICTIM JOHNSON:  Well, I'm going to say, he's not**

16   **schizophrenic.  That's -- well, that's what the floor is**

17   **for.  He's not schizophrenic.  I disagree -- I mean, I know**

18   **he's not.  So I'll let the lawyers address.  So he's not**

19   **schizophrenic.  That's a lie.  That's -- he's not**

20   **schizophrenic.  He came to FCI Victorville as a care level**

21   **-- I remember he was a care level health 1, which means he**

22   **had no mental issues when he first got to Victorville.  It's**

23   **a minimum security facility.  He was a care level health 1.**

24   **Mental health care level 1, which means you have no mental**

25   **illness.**

            So I do remember that.  So I don't know where the
schizophrenic came from, but apparently he can be anything
after you attack somebody like that to get a lighter
sentence, or not to end up in the super max prison.  But
he's not schizophrenic.  I would testify that all day long,
not because I got attacked.  I know -- I know that's not
true.

            But, anyway, the permanent scars that it caused
me.  I don't have all the feelings on my left side anymore.
I can't play golf anymore.  I can't swing a golf club.  I
can't even -- my wife can't even hug me -- causes sensation
on that side -- anymore.  It changed my entire life.

            And I think it impacted the Federal Bureau of
Prisons because most of the wardens in the Federal Bureau of
Prisons when they did rounds in the housing units, or they
stood main line, they did it by themselves.  They usually
didn't have an entourage to go with you when you actually
made rounds throughout your own institution, but I'm pretty
sure --

            I can bet my whole paycheck that you can't find
another warden at a medium or high-security prison would
make rounds by themselves again after that attack happened
to me.  Because that's the first time that ever happened
that I know of in the Federal Bureau history where a warden
was attacked that vicious like that.

1          **Because when you look at somebody like him -- and,**
2   **you know, I know evil when I see it.  You know, I work in a**
3   **-- in fact, I'm in a maximum prison now.  I'm the warden at**
4   **a maximum security prison today, and I would tell you, he**
5   **still is the most dangerous inmate, even if he would be at**
6   **my prison.  He's a dangerous inmate.**
7          **And I would tell you that -- I would testify**
8   **'cause it's going to happen.  When he's let out of super max**
9   **prison, he's going to do it again.  The next person won't be**
10  **so lucky.  I was fortunate because I am a military vet, and**
11  **I can defend myself.  He just didn't know that.**
12          I am a combat vet.  I can defend myself.  That's
13  the only thing that saved my life was my military training
14  or I would be dead right now.  That's the only thing that
15  saved my life was the training I got in the military.
16  That's why I'm standing here before you, talking today.
17          **But I just can't -- I mean, I just can't**
18  **believe -- it really impacted my life.  I did come to -- I**
19  **guess I've been holding it in until I heard you say what you**
20  **said that I just can't -- even going into restaurants, when**
21  **somebody come behind me -- no one can walk behind me anymore**
22  **because of what he did.  No one can walk behind me without**
23  **me being fear -- I'm always on guard when somebody walk**
24  **behind me in a restaurant, in an institution, or even in my**
25  **office.  I got a fear now of somebody being behind me**

1  because of that attack.

2          So that's all I wanted to say.  I just wanted you

3  to hear my story.  And I would tell you -- I'm going to say

4  it on record because I want it on record because it's not

5  because he attacked me, it's because it's the truth, he is

6  not schizophrenic.  I'm saying it on record because I want

7  it on record that he's not.  You can check with the B.O.P.

8  He is not schizophrenic.

9          THE COURT:  All right.  Could I just ask you:  How

10 old is your daughter?

11         VICTIM JOHNSON:  She's 25 now.

12         THE COURT:  What is she doing these days?  Is she

13 in school?

14         VICTIM JOHNSON:  She finished school.  She works

15 -- in fact, she's going back to school to do something else.

16 She's going to be a permanent student, but -- kids that go

17 to school.  She's going to be a permanent student, but she

18 lives in Long Beach with her sister, my oldest daughter, and

19 she works at Sears.  And she works and goes to school, so...

20         THE COURT:  All right.  Thank you for coming from

21 Louisiana out here today to give me your side of the story.

22         VICTIM JOHNSON:  All right.  Thank you.  That's

23 all I got.

24         THE COURT:  Thank you.

25         Ms. Potashner.

1           MS. POTASHNER:  Thank you, Your Honor.  I'm not

2  here this morning to, in any way, lessen or minimize what

3  Warden Johnson went through.  I recognize that this is,

4  essentially short of murder, this is a serious type of

5  offense that this Court could possibly be adjudicating.  I

6  recognize that the Bureau of Prisons' security and safety is

7  of paramount concern to all involved.

8           We've stipulated to a 20-year sentence.  The only

9  question for this Court in my mind is to run five of those

10  20 years concurrent to his current sentence.

11           I think it is important and I appreciate that the

12  Court has taken its time and care to read all of the

13  documentation and information that has been presented to it

14  because in the recitation of the facts about my client, it's

15  clear that the Court really understands much about his

16  background.  I would like to add a little bit to that,

17  though.

18           You have a 36-year-old man in front of you today.

19           THE COURT:  I'm sorry -- 36?

20           MS. POTASHNER:  I believe it's 36, Your Honor.

21  1982 to present.

22           THE COURT:  All right.  I'm sorry.  I thought he

23  was 30, but --

24           MS. POTASHNER:  That's fine.

25           And when he was nine-years-old, he was living in

1    Uzbekistan and that was the fall of the Soviet Union.  And

2    as the Court indicated, that was a chaotic time in that

3    region's history.  It was lawless.  It was scary.  There was

4    an oppressive Government.  His parents became religious,

5    converted during that period of time and because of their

6    conversion because of their own personal family history and

7    their own ethnicity, they were targeted within their own

8    community.

9            Mr. Kurbanov went to a school that was primarily

10   of Russian descent.  Because he was Uzbeki, that made a

11   difference there and he was tormented and beaten there.

12   When he got home, there was no relief from that because,

13   perhaps -- and I'm speculating -- the stress and the

14   oppression that his parents were feeling were transferred to

15   where they had control and power which was within the home.

16   His sister indicated, and Mr. Kurbanov has described, his

17   father drinking and beating him and having him beat his

18   sister at a young age.  This is a boy who was nine, ten

19   years old living in that environment.

20           When he was 17, he was walking down the street and

21   a bomb exploded within feet of him.  He was blown back, hit

22   his head, lost consciousness.  And when he woke up, he woke

23   up to shrapnel and blood and bodies and chaos.  He was a

24   teenager at that time.

25           During that time period, not only was he

1  experiencing what was happening outside in the community,

2  outside within his family home, but he was also experiencing

3  uniqueness inside his own brain.

4          When he was 14 and 15 years old, he started to

5  experience hallucinations.  He experienced visual, auditory

6  and smell hallucinations.  He had the sensation of being

7  choked from outside.  He believed that there was a devil

8  inside him struggling to take control of him.  This was when

9  he was 14 or 15 years old.

10          And clearly what was going on in his country and

11  his community and his home was not at all equipped to deal

12  with a boy who was starting to show psychiatric problems

13  that went untreated.

14          During this time period, before the car bomb went

15  off, his parents were both arrested.  His mother was taken

16  away first, then she was returned in exchange for his

17  father.  His father was taken away and tortured.  His nails

18  were ripped out of his skin, and he was returned a broken

19  man.  That was the childhood that Mr. Kurbanov had there.

20          It didn't end for him with those experiences.  In

21  2000, he was beaten outside of a stadium, beaten to the

22  point where he was unconscious and he suffered head injuries

23  there.

24          He then is brought into the army.  He's serving as

25  a soldier.  And part of -- again, I am not a psychiatrist or

1    psychologist, but I assume from the environment that he was

2    in, the aggression that was in the environment that was

3    translating to him, being the lowest man on the totem pole,

4    while he was in the military.  So what that meant -- their

5    form of hazing was beating.  He was beaten when he was in

6    the military.  He was beaten with a butt of rifles.  He was

7    beaten to unconsciousness.  He was held against the wall by

8    his neck and his head was slammed against the wall

9    repeatedly.  That was his experience in the military for his

10   country.

11          He then fled.  He was a refugee in Kazakhstan, and

12   then he came to the United States.  That is the history and

13   the psychology of the person who came to the United States

14   in his early 20s.  Not only was he carrying his life

15   experience, the aggression, the chaos, the lawlessness, the

16   beatings.  Not only was he carrying that on the outside, he

17   was carrying a complex psychological dysfunction on the

18   inside.

19          What we know from Dr. Ghannam's report is that he

20   suffers from P.T.S.D., from depression with psychiatric

21   features, with anxiety disorder, with post-concussive

22   syndrome, and he's demonstrated suicidality multiple times.

23   That's the person who came to the United States.  That's the

24   person who wasn't equipped to be a fully functioning adult

25   in the United States.  That was a broken person who was

1  delivered to the United States.

2          He's then in custody and fast-forwarding to the

3  days he attacked the warden, days before he's in

4  Victorville.  He is not properly medicated.  And with all

5  due respect, I believe he needed to be medicated and, as did

6  the doctor who evaluated, Dr. Ghannam.  That he was not

7  properly medicated, that he was isolated from his family and

8  that was the state that he was in Victorville when he

9  attacked the warden.

10          Now, as I started with, I'm not here to say that

11 that attack wasn't gruesome and unwarranted and worthy of a

12 substantial punishment, because it is.  My client has wanted

13 to accept responsibility for his behavior since the get-go.

14 My client, believe me, without advice of counsel, wrote to

15 the Court directly through the institution that he was

16 housed in to say:  I want to plead guilty.  He is ready to

17 take responsibility and has been.

18          So this -- and my explanation of his background

19 and his pyschological history is not an excuse or way to

20 justify his behavior, but it is critical that this Court

21 take all of that in consideration when assessing what the

22 right punishment is here.

23          And I think what also is critical is what will

24 happen to Mr. Kurbanov when he leaves this Court to serve

25 the balance of this sentence.  He's 36 years old.  What we

```
 1    know from Expert Beasey (ph), who is a 36-year veteran of
 2    the Bureau of Prisons, a person who currently does risk
 3    assessments for the Bureau of Prisons and also works
 4    privately, clearly this person who's an expert of assessment
 5    of the B.O.P. tells us that Mr. Kurbanov will spend the rest
 6    of his time in custody at ADX.  He will spend the next
 7    70 months -- this is an estimation -- that he will spend the
 8    next 70 months -- which is more than six years.  He will be
 9    in the control -- I believe it's the control unit of ADX.
10    There, he will spend 23 hours, every single day inside his
11    cell, alone.  He will eat, sleep, shower and fully exist
12    inside that cell for 23 hours every day.  He will get out
13    for one hour a day for recreational time.  And what
14    recreational time means is that he'll be fully shackled,
15    he'll be put in another cage.  The cage will have cement
16    around it where he cannot see forward, but he can see the
17    sky.  And he will be alone in that cage for that one extra
18    hour a day.
19            And then he will be returned to his cell.  He will
20    have no human contact except for screaming through the walls
21    and whatever the guards want to say to him or not say to
22    him.  That will be his life for the next 70 months.
23            His life will be in the size of a space of a
24    parking space, eighty-seven square feet, where there's a
25    bed -- a bed and a stool and a desk that are affixed to the
```

1   ground or not movable.  He will have a blanket, and he will

2   have very few personal items.  His interaction with the

3   outside world will be a video monitor where he can get some

4   programming.  And hopefully the B.O.P. will give him

5   whatever they can through that video monitor to address his

6   serious psychological issues.

7           After those 70 months, his life is not going to

8   change dramatically.  What will happen is, instead of having

9   seven hours a week outside of that cell in another cage by

10  himself, he will have ten hours a week in that cage, three

11  additional hours.  And that will be his life for the next --

12  our request would be for the next 35 years.  That will be

13  his life.  He will not be able to hug his family members if

14  they are ever able to make it or willing to make it to visit

15  him.  He will not have human contact or interaction

16  physically.  That will be his life.  That is a substantial,

17  substantial punishment.

18          What we know from Craig Hainey and the article

19  that was submitted to this Court is that being in isolation

20  for more than ten days starts to have dramatic impact on a

21  human being.  Human beings are not wired to be in isolation

22  for periods of time.  We are social beings who need

23  interaction.  Mr. Kurbanov will not have that basic need.

24  And I understand why.  I understand why it is important to

25  separate him and to cage him like an animal for 35 years.

1     If this Court were to give him 15 years

2  consecutive instead of 20 years and if he were to get some

3  good time credit, which I do not know he will even get, he

4  would not be eligible for release until he's nearly 70 years

5  old.

6     And then he's not going to get released into the

7  United States of America.  He will be in deportation

8  proceedings, if he survives that long.  Because what else we

9  all know is that the length of -- the life expectancy for

10  somebody in custody is greatly truncated to a person who is

11  out in our community.

12     So if he has a few years after being isolated for

13  35 years, it will not be free in the United States of

14  America.

15     So that's why I ask the Court -- and I recognize

16  that the Court has the discretion to run all 20 years

17  consecutive, but I ask the Court, based on the complexity of

18  his background, the complexity of his psychological makeup

19  and the dire situation that he will be in for decades after

20  today's date, I ask the Court to take that all into

21  consideration and run five of those 20 years concurrent and

22  give him the other 15 years consecutive.

23     And, finally, I would ask the Court, when

24  Mr. Kurbanov has his opportunity to allocute and if he does

25  decide to speak to the Court, I would ask the Court to

1  consider his background, his mental health history and his

2  diagnoses and issues when the Court is evaluating the

3  statements that he may make to the Court.

4          THE COURT:  Thank you.

5          Before I hear from the defendant, Ms. Yang, do you

6  wish to respond?

7          MS. YANG:  Your Honor, just very briefly.

8          The Government is not unsympathetic to the

9  defendant's situation.  The Government recognizes that his

10  social history, much of which is self-reported and not

11  corroborated by objective sources, is troubling and does set

12  forth childhood and background that is traumatic.

13          The Government also recognizes and is not

14  unsympathetic to his mental health issues which are now

15  being treated.  Before apparently when he was out of custody

16  were not being treated.  The Government just does not want

17  the Court or the parties here to lose focus as to what

18  really happened in this case and who really is going to

19  suffer.  It's almost like a competition who's going to

20  suffer worse.

21          There is no competition here.  The Government

22  recognizes that the defendant's conditions of confinement

23  will be incredibly restrictive.  The Government would simply

24  like to note for the Court that is because of the

25  defendant's actions.

1            Prior to his attempt to kill the warden, he was in

2    the general population facility.  He was free to engage with

3    other humans, other inmates, other B.O.P. staff.  He lost

4    that privilege when he attempted to kill the warden.  It is

5    not at all surprising that his attempt to kill the warden

6    and his ongoing threats to kill B.O.P. staff, that the

7    B.O.P. has no choice but to put him in a facility where he

8    is the most restricted.  And again, this was based on the

9    defendant's own actions and choices.

10           And the person in this case who is going to suffer

11   for the rest of his life is Warden Calvin Johnson.  I think

12   he explained to you the initial trauma, the initial impact

13   on his life to not just himself physically and emotionally,

14   but to his family.  His mother, his daughter who thought she

15   was on the verge of losing yet another parent.  His entire

16   family.

17           But what the Government also wants to stress to

18   the Court is that this also changed how Warden Johnson does

19   his job, which also changes how other inmates' lives are

20   impacted.

21           Prior to this attempt on his life, Warden Johnson

22   was the kind of warden who wanted to engage with the

23   inmates.  He wanted to make their lives more livable while

24   incarcerated.  He stood main line every day just so the

25   inmates could approach him and ask him questions and he

1    could help them with problems.  He walked the housing units

2    on his own to let these inmates know that he's not just some

3    figurehead sitting in his office who doesn't care about

4    their lives.  But that, in fact, he was very interested and

5    wanted to make sure that whatever he could do to help them,

6    he would do.

7            Because of this attack on his life, Warden Johnson

8    no longer does that.  He no longer feels the freedom and the

9    safety to engage with inmates.  He now walks, as he

10   mentioned to the Court, with an entourage which is something

11   he never wanted before.  It makes him far less accessible to

12   the inmates.  He doesn't stand main line on his own anymore.

13   He is much more closed off to the inmates, which is not the

14   way he wanted to do his job.

15           In addition, to the emotional impact it has on him

16   that will be with him for the rest of his life, the impact

17   it's had on his relations with his family members, it also

18   impacts one of the most important things that he loves to do

19   and that's his job.  And the Government would just like the

20   Court to keep that in mind when fashioning the appropriate

21   sentence in this case.

22           And unless the Court has any further questions,

23   the Government would submit on its papers.

24           THE COURT:  Mr. Kurbanov, you have the right to

25   speak to me at this time if there's anything that you would

1   like to say.  Now is your opportunity.

2          THE DEFENDANT:  Yes, I would like to say a few

3   words.

4          Thank you, Your Honor.  Thank you that you heard

5   my case today.  And I want to thank my lawyer for help that

6   she provided to me.  Everything you heard just now about my

7   story and about my health, it is all true, but I want to

8   talk today about other things.

9          When I arrived to the United States as a refugee,

10  I really loved this country.  I had family, I had work, I

11  had almost everything.  But as you can understand, I had

12  really big problems with Russia and with Russian Government,

13  and I really do not like Russia.

14         So everything in my life was great until I was

15  arrested for this material help to terrorist as they called

16  it.  That changed my life drastically.  I lost everything.

17  My work, my family, my freedom.  And I was not guilty

18  completely in what they claimed I did.  They made a

19  terrorist out of me.  It was not true and that made me very

20  angry.

21         And after that, I start study, in particular, I

22  start study:  What is United States?  What is Americans as

23  people?  And after I did my research, I got disappointed and

24  disillusioned in the United States, and I did not believe

25  this country anymore.

1           And, of course, my second offense, I'm completely

2    guilty in it.  I admit my guilt.  But I am not sorry about

3    it.  Because United States and Russia, they are in war with

4    my country, and they are killing my brothers and sisters.

5    So what I tried to do, it wasn't just attempt to kill

6    somebody.  He was supposed to die because he represented

7    this state, which destroyed my family and my life and which

8    keep killing my brothers and sisters in Iraq and Syria.

9           I did love this country in the past, but I don't

10   believe it anymore.  Because so many of them are unjust.

11   They killing other people, and they are Godless.  So today I

12   can say that I trust today only one state, which is Islam

13   state.  And I can just say:  Long live Islam state and death

14   to the rest.  Those who are not following Islam.  That's it.

15   Thank you.

16           THE COURT:  All right.  Is there any legal cause

17   why sentence should not now be imposed?

18           MS. POTASHNER:  No, Your Honor.

19           MS. YANG:  No, Your Honor.

20           THE COURT:  I originally stated my intended

21   sentence was a sentence of 20 years to run consecutively to

22   the term being served in case number 13-120 in the District

23   of Idaho, and I intend to abide by that and impose that

24   sentence.

25           It's always been my -- in the 19 years or so that

1   I've served as a district judge, it's always been my
2   philosophy that a defendant has the right to allocute and,
3   therefore, I would not or should not impose a sentence
4   longer than my intended sentence based on what a defendant
5   said in his allocution.  My intended sentence before I heard
6   the defendant speak, of course, was the statutory maximum,
7   so the policy wasn't really tested today as a practical
8   matter.
9           But this is a very difficult case because of the
10  horrible nature of the attack, the affect that it had on
11  Warden Johnson not only physically, but in terms of his
12  family and in terms of the change that it has made in his
13  ability to do his job.
14          The defendant -- Mr. Kurbanov, every time I read a
15  presentence report with the details of a terrible series of
16  life experiences and a terrible childhood, I think:  Well,
17  that's the worst one I'll ever have to read.  Mr. Kurbanov's
18  life before he came to the United States was truly one of
19  the worst I have ever read from a very young age.  And the
20  series of mistreatment -- and that's really not a strong
21  enough word, but the series of experiences he had from a
22  young age until he immigrated are really hair-raising.
23          But, sadly, the combination of those experiences
24  have led him to a point where he's truly a danger to
25  everyone around him.  And what he said in his allocution

1  confirms that.  Defense counsel is correct.  He accepted

2  responsibility for this offense early, wrote to the Court,

3  came into the court and explained that he wanted to enter a

4  plea of guilty and did so, but it's clear that despite how

5  difficult his life will be in prison, as defense counsel

6  eloquently explained, it's really hard to conceive of a way

7  that would ensure the safety of others, other than for the

8  defendant to be housed in isolation.

9          So my hope is only that he receives whatever

10 treatment might assist him in coping with his many years of

11 isolation ahead so that when he is released, he can be

12 around others without putting his current intentions into

13 practice.

14         So I have considered the sentencing factors set

15 out at 18, United States Code Section 3553(a), as well as

16 the advisory sentencing guidelines and impose sentence as

17 follows:  It's ordered that the defendant shall pay to the

18 United States a special assessment of $100 due immediately.

19         Any unpaid balance shall be due during the period

20 of imprisonment at the rate of not less than $25 per quarter

21 pursuant to the B.O.P.'s Inmate Financial Responsibility

22 Program.

23         Pursuant to sentencing guideline section 5e1.2a,

24 all fines are waived as the Court finds that the defendant

25 does not have the ability to pay a fine.

1            Pursuant to the Sentencing Reform Act of 1984,

2   it's the judgment of the Court that the Defendant,

3   Fazliddin Kurbanov, is hereby committed on Count 1 of the

4   indictment to the custody of the Bureau of Prisons for a

5   term of 240 months to run consecutively to any undischarged

6   term of imprisonment imposed in United States v. Kurbanov,

7   case number 13-120-EJL in the District of Idaho.

8            The Court recommends that the Bureau of Prisons

9   conduct a mental health evaluation of the defendant and

10  provide all necessary treatment.

11           Upon release from imprisonment, he shall be placed

12  on supervised release for a term -- what's the term in the

13  case in the District of Idaho of supervised release?  Is it

14  a lifetime term?

15           MS. YANG:  Your Honor, it is, I believe -- I have

16  the J and C -- I'm sorry, Your Honor.  One moment.

17           THE COURT:  Go ahead.

18           MS. YANG:  It is a three-year term concurrent on

19  all counts.

20           THE COURT:  Then I would impose a term of

21  supervised release of life to run concurrently with a term

22  in Idaho under the following terms and conditions:

23           He shall comply with the rules and regulations of

24  the U.S. Probation Office and General Order 05-02, with the

25  exception of Conditions 5, 6, and 14 of that order.

1    The defendant shall not commit any violation of

2 local, state or federal law or ordinance.

3    As directed by probation, he shall notify specific

4 persons and organizations of specific risks and shall permit

5 the probation officer to confirm his compliance with such

6 requirement and to make such notifications.

7    He shall refrain from any unlawful use of a

8 controlled substance.  He shall submit to one drug test

9 within 15 days of release from custody and at least two

10 periodic drug tests thereafter, not to exceed eight tests

11 per month as directed by probation.

12    He shall participate in mental health treatment

13 which may include evaluation and counseling until discharged

14 from the treatment by the treatment provider with the

15 approval of the probation officer.

16    As directed by the probation officer, he shall pay

17 all or part of the costs of the court-ordered treatment to

18 the aftercare contractors during the period of supervision

19 and provide payment and proof of payment as directed by

20 probation.

21    If the defendant does not have the ability to pay,

22 no payment shall be required.

23    The Court also recommends that the Bureau of

24 Prisons provide the defendant with at least a 90-day supply

25 of medication upon his release from custody.

1          During the period of supervision, he shall pay the

2    special assessment in accordance with this judgment's orders

3    regarding such payment.

4          He shall comply with the immigration rules and

5    regulations of the United States and if deported from this

6    country, either voluntary or involuntarily, not re-enter the

7    United States illegally.

8          He is not required to report to the probation

9    office while living outside of the U.S., but within 72 hours

10   of release from any custody or any re-entry to the United

11   States during the period of supervision, he's to report for

12   instructions to the U.S. Probation Office located at the

13   United States Courthouse -- I think actually it's -- they're

14   no longer at 312 Spring Street, I believe.

15          THE CLERK:  No, Your Honor, they are not.

16          THE COURT:  I think they are in the Roybal

17   Building.  So that would be 255 Temple Street in

18   Los Angeles, California.

19          The defendant shall cooperate in the collection of

20   a DNA sample from the defendant.

21          Does the Government have a motion?

22          MS. YANG:  Yes, Your Honor.  The Government moves

23   to dismiss Counts 2 and 3 of the indictment in the interest

24   of justice.

25          THE COURT:  Thank you.

1          Again, the Court thanks Warden Johnson for

2    appearing here today, and I wish you the best in the future

3    and your family also.

4          Mr. Kurbanov, you have the right to appeal.  Let

5    me start over again.  You entered a plea of guilty in this

6    case, and by doing so you gave up many of your rights to

7    appeal.  To the extent that you still have any right to

8    appeal the Court's decision as to your sentence, you may do

9    so by filing a Notice of Appeal with the Clerk of Court.

10          You may request that you be allowed to file any

11   notice of appeal without paying the fee that's usually

12   required.  You have 14 days to file any Notice of Appeal or

13   you lose your right to appeal altogether.  Do you

14   understand?

15          THE DEFENDANT:  Yes.

16          THE COURT:  All right.  Thank you.

17          MS. YANG:  Your Honor, just for the record, for

18   defendant's sake, in his plea agreement at paragraph 17 and

19   18, those set forth the parameters of his right to appeal.

20          THE COURT:  That's correct.  All right.  Thank

21   you.

22          MS. POTASHNER:  Thank you, Your Honor.

23          MS. YANG:  Thank you, Your Honor.

24          *(Thereupon, proceedings adjourned.)*

25

```
1

2

3                                 -oOo-

4

5                             CERTIFICATE

6

7          I hereby certify that pursuant to Section 753,

8   Title 28, United States Code, the foregoing is a true and

9   correct transcript of the stenographically reported

10  proceedings held in the above-entitled matter and that the

11  transcript format is in conformance with the regulations of

12  the Judicial Conference of the United States.

13

14  Date:  August 17, 2018

15

16                              Lisa M. Gonzalez
                            /s/_____
17                          Lisa M. Gonzalez, U.S. Court Reporter
                            CSR No. 5920
18

19

20

21

22

23

24

25
```